UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BENJAMIN V. MÁRQUEZ by his Guardian ROSANNA A. MÁRQUEZ,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | No. 21 C 643<br><br>Judge Rowland |

## ANSWER

Defendant United States of America, by its attorney, John R. Lausch, Jr., United States Attorney for the Northern District of Illinois, answers the complaint as follows:

### First Defense

The Illinois doctrine of comparative fault, 735 Ill. Comp. Stat. 5/2-1117, applies to eliminate or reduce any recovery against the United States.

### Second Defense

Any recovery by plaintiff should be eliminated or reduced by amounts paid by insurance or government benefits and as provided by 735 ILCS § 5/2-1205.

### Third Defense

Plaintiff's recovery, if any, should be limited to the amounts set forth in the administrative claim.

### Fourth Defense

Plaintiff has no right to a jury trial against the United States under the Federal Tort Claims Act.

**Fifth Defense**

Answering the specific allegations of the complaint, defendant admits, denies, or otherwise avers as follows:

(Unnumbered) **Complaint:** I. BRIEF SUMMARY Plaintiff Benjamin V. Márquez ("Benjamin" or "Plaintiff") served his country as a U.S. Marine for seven years before receiving an honorable discharge and serving two more years in the Marine Corps Reserve. On the day before Thanksgiving in 2018, he went to the Jesse Brown Veterans Affairs Medical Center ("Jesse Brown") in Chicago for what he was led to believe by his doctors would be routine temporomandibular joint (TMJ) surgery. As a result of the deficient care he received, Benjamin suffered a life-threatening subdural hematoma (a massive brain bleed) in the recovery room and had to be taken to the University of Illinois for emergency brain surgery, after which he remained in a persistent vegetative state for ten days. While the emergency surgery saved his life, Benjamin now suffers from permanent physical, mental and emotional impairments for which he will require constant medical and other assistance. Even with such care, the quality of Benjamin's life has been severely and irreparably compromised. This Complaint seeks compensation for the grievous harms inflicted upon Benjamin by the VA's incompetence.

**Response:** This unnumbered summary constitutes plaintiff's characterization of this civil action. To the extent that an answer might be deemed required, defendant denies.

1. **Complaint:** This case is brought in the United States District Court for the Northern District of Illinois, Eastern Division under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 (b)(1) and 2674 ("FTCA"). Plaintiff's injury and damages resulted from Defendant's wrongful acts at the Jesse Brown facility in Chicago.

**Response:** Admit that the case is filed in this district court and may arise under the

FTCA, as a tort suit against the United States of America, without prejudice to any procedural defenses, but otherwise denies.

2. **Complaint:** Plaintiff filed a timely claim with the United States Department of Veterans Affairs (the "VA") on July 16, 2020 (the "Claim"). A copy of the Claim, without exhibits, is attached hereto as Exhibit A. The Claim is extensive and provides as exhibits Benjamin's medical records, including CT and MRI imaging, and the expert reports of Dr. Scott Levin, an Oral and Maxillofacial Surgeon, Dr. Gary S. Skaletsky, a Neurosurgeon, Dr. Gary M. Yarkony, a Physical Medicine and Rehabilitation Physician, and Ph.D. Economists Stan V. Smith and Gregory P. Adams. By letter dated January 13, 2021, the VA denied Plaintiff's Claim, asserting without evidence or explanation that there purportedly "was no negligent or wrongful act on the part of an employee of the VA acting within the scope of employment that caused [Plaintiff] compensable harm." Plaintiff brings this action within six months of the date of the VA's denial letter. Accordingly, Plaintiff has exhausted all administrative remedies and has timely filed his action.

**Response:** Admits allegations as to exhaustion, but denies all allegations related to the accuracy or validity of the referenced expert opinions or the allegations in the claim.

3. **Complaint:** Benjamin is a resident of Chicago, Cook County, Illinois. He brings this action through his sister and Court-appointed Guardian, Rosanna A. Márquez ("Rosanna"). Benjamin is 59 years old having been born on September 27, 1961.

**Response:** Admits that probate records appended to the complaint reflect the guardianship of Rosanna Marquez over Benjamin Marquez and admits that Benjamin Marquez was born on September 27, 1961. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; accordingly, they are denied.

3

4. **Complaint:** The Order appointing Rosanna as Benjamin's Guardian was entered in the Circuit Court of Cook County on January 28, 2019 and remains in full force and effect. A copy of the Guardianship Order is attached hereto as Exhibit B.

**Response:** Admits that an order in the Circuit Court of Cook County is appended as Exhibit B to the complaint and it reflects Rosanna Marquez's appointment as plenary guardian over Benjamin Marquez. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; accordingly, they are denied.

5. **Complaint:** Defendant United States of America, at all times material herein, owned, operated, managed and controlled, through the VA, the Jesse Brown facility located at 820 S. Damen Ave, Chicago, Cook County, Illinois.

**Response:** Admits that the U.S. Department of Veterans Affairs ("VA") is an agency of the United States, and further admits that the VA operates the Jesse Brown VA Medical Center located at 820 S. Damen Ave, Chicago, Cook County, Illinois. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; accordingly, they are denied.

6. **Complaint:** Benjamin is a U.S. Marine veteran who served on active duty for seven years, rose to the rank of sergeant and was honorably discharged; thereafter, he served two years in the Marine Corps Reserve. He receives his medical care from the VA.

**Response:** Admits that plaintiff is a U.S. Marine veteran who served on active duty for approximately seven years, was honorably discharged, and receives or received medical care from the VA. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; accordingly, they are denied.

7. **Complaint:** On or about November 21, 2018, Benjamin underwent arthroscopic

surgery at Jesse Brown for complaints relating to TMJ facial pain and dysfunction. The surgery was performed by Dr. Raza Hussain (the attending physician) assisted by Drs. Benjamin Louis Palla, Shouvik Ponnusamy and Timothy Vadeboncouer along with Ms. Ruta Shabez, all of whom were employees of Defendant (or individuals working under the direction and supervision of Defendant's employees) and all of whom owed Benjamin a duty to provide him with care with the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances.

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph as to Timothy Vadeboncouer and Ruta Shabez; accordingly, they are denied. Otherwise, admits.

8. **Complaint:** In negligent breach of that duty, however, the care provided to Benjamin by Defendant and its personnel fell well below the applicable standard of care in at least the following respects: a. The VA failed to explore or exhaust non-surgical alternatives to treatment. b. Even if surgery was indicated, the VA erred in selecting an arthroscopic procedure, particularly in light of the risks attendant to that procedure as revealed by pre-operative MRI images. c. The VA failed to disclose the foregoing risks to Benjamin and otherwise failed to obtain his informed consent to the arthroscopic procedure it performed. d. The VA negligently performed the arthroscopic procedure it selected, using improper techniques.

**Response:** Denies.

9. **Complaint:** The foregoing negligent breaches are described further in the reports of Plaintiff's experts, Dr. Scott Levin and Dr. Gary S. Skaletsky, copies of which are attached to the Affidavit of Plaintiff's counsel submitted herewith.

**Response:** Admits that the referenced reports allege negligent breaches and are

attached to the Affidavit of Plaintiff's counsel, but otherwise denies.

10. **Complaint:** In his initial report dated May 30, 2019, Dr. Levin, an Oral and Maxillofacial Surgeon and a recognized authority on TMJ surgery, stated to a reasonable degree of scientific and medical/dental certainty that the care provided to Benjamin deviated from the applicable standard of care in the following respects: It is my opinion, if surgery was indicated at all (failure of Non-Surgical Management) that this TMJ Arthroscopic procedure should not have been offered to or performed on this patient given the following: 1) Lack of proper determination of pain origin, appropriate muscular exam, differential nerve block (auriculotemporal). 2) There was no "appropriate pre-operative NON Surgical management" i.e. splint therapy, physical therapy, physical and psychological management which could have avoided surgery altogether if successfully implemented. 3) There is no reference in the records to two pre-op MRI images that show probable communication between the superior joint space and the cranial base/fossa. This suggests that the surgical team either did not note the probable communication or did not understand its significance. This probable communication significantly increased the risk of intracranial complications resulting from the use of an Arthroscopic surgical approach vs. an open technique (due to factors including, but not limited to, the insufflation and lavage associated with an arthroscopic procedure). There is no documented discussion in which the patient was warned of the increased risk associated with the probable communication shown on the pre-op MRI. 4) Because of the increased risk of intracranial complications via an Arthroscopic procedure, if a procedure was necessary (following failure of PROPER NON surgical workup including a proper informed consent), it should have been done with an open technique which would give you direct visualization of the joint space and significantly minimize any injury to the intracranial contents. Proceeding instead with an Arthroscopic procedure, under the circumstances, significantly

increased the risk of intracranial complications, including but not limited to, the hematoma the patient ultimately suffered. In my opinion this situation as discussed above fails to meet the standard of care with respect to lack of proper informed consent, i.e. mandatory discussion regarding significantly increased risk of intracranial complications when probable communication exists between the superior joint space and the intracranial fossa as depicted in the preoperative MRI. As well, there is failure to meet standard of care due to: lack of appropriate NON surgical management thereby not affording the possibility of avoiding surgery altogether, and improper selection of and performance of surgical technique.

FN1 Dr. Levin is an Oral and Maxillofacial Surgeon with 40 years of experience in all phases of dental healthcare. In addition to running a clinical practice, Dr. Levin has served as an Assistant Professor at the Marquette School of Dentistry and an international lecturer on Oral and Maxillofacial Surgery including, specifically, the TMJ surgery at issue in this case. Dr. Levin is a member of the Academy of Oral and Maxillofacial Surgery as well as other professional societies. Dr. Levin's complete reports and CV were tendered to the VA as part of the Claim.

**Response:** Admits that a report is provided that states those opinions as those of a doctor with the referenced name, but denies the validity and accuracy of those opinions and specifically denies that any VA physicians failed to meet the standard of care. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; accordingly, they are denied.

11. **Complaint:** In his initial report dated June 13, 2019, Dr. Skaletsky, a board certified Neurosurgeon, opined to a reasonable degree of medical and neurosurgical certainty as follows: In my opinion, the neurologic deterioration sustained by Mr. Marquez on November 21, 2018, was caused by the development of an acute right sided subdural hematoma. The basis for

7

this conclusion is the correlation with the symptoms, the radiographic and intra-operative neurosurgical findings. From a neuro-anatomic perspective, this pathology occurs when there is a rupture of a subdural bridging vein, and this allows the formation of a hemorrhage and hematoma. In my opinion, the etiology of this acute subdural hematoma was an intra-operative rupture of a rightsided subdural vein during the TMJ procedure performed by Dr. Hussain. The basis for this conclusion is the chronologic timeline of the operation and the onset of neurologic deterioration, the lack of any other precipitating factor that could have been responsible, and the proximity of the TMJ and the floor of the right temporal lobe fossa. The area is separated by a very thin layer of bone, and in this case, based upon the pre-operative MRI, there was a high suspicion of an actual lack of any bone separating the TMJ from the floor of the temporal fossa. The mechanics of the dural venous rupture would have been either the entry of an operative instrument into the cranial cavity lacerating a subdural vein or the force of the lavage that was performed causing a rent in the subdural vein. It is my opinion, stated from a neurosurgical point of view, that Dr. Hussain breached the standard of care expected from a reasonably trained surgeon operating in the proximity of the intracranial compartment. That standard of care would require a surgeon, when performing an extra-cranial operation not intended to involve the brain or structures within the intracranial cavity; to not enter the intracranial cavity. Entering that compartment is a breach of the standard of care. As a result of this breach, Mr. Marquez sustained a life-threatening subdural hematoma, necessitating another operation, with the attendant risks and complications of an emergency craniotomy, as well as prolonged hospitalization and treatment of residual neurological deficit.

      FN2 Dr. Skaletsky has been a board certified Neurosurgeon since 1984. He is the Founder and Medical Director of the Multi-Disciplinary Pain Treatment Center of Mercy Center for Health

Services in Aurora, Illinois. His complete reports and CV were tendered to the VA as part of the Claim.

**Response:** Admits that a report is provided that states those opinions as those of a doctor with the referenced name, but denies the validity and accuracy of those opinions and specifically denies that any VA physicians failed to meet the standard of care or caused plaintiff any injury. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; accordingly, they are denied.

12. **Complaint:** Following his receipt of additional medical records, Dr. Skaletsky issued a supplemental report that "should be used in conjunction with my report of June 13, 2019": In my opinion, the records strongly support my earlier conclusion that Dr. Hussain entered the intracranial compartment during the performance of the elective right TMJ operative procedure. The basis for this statement is that as of the note from the VA Hospital of June 18, 2019; "patient now has CSF leak which would be most safely addressed by surgeon who has previously operated on patient". Additionally, there was a right ear effusion of uncertain source, but the ENT physician cautioned against the placement of a PE tube due to the possibility of a cerebrospinal fluid leak (May 7, 2019). From an anatomic and physiologic point of view, the area of the TMJ surgery is immediately inferior to the right temporal lobe skull base. The only etiology of a right ear fluid accumulation and the diagnosis of cerebrospinal fluid leakage in this case would of necessity be a penetration of the dura at the base of the temporal lobe with an object that caused the dural rent and the subdural hematoma. The only penetrating object that could have accomplished these conditions had to have been a surgical instrument at the time of the TMJ surgery (November 2018); this is entirely consistent with my stated opinions in my report of June 13, 2019. An inferior dural leak would have been impossible to visualize by the neurosurgeon at the time of craniotomy. It

would have entailed a sub temporal lobe intra-operative examination, and this would have placed the swollen, inflamed portion of the brain at great risk of further injury, and it would have been surgically contra-indicated. The neurosurgeon quite properly did not take this risk at the time of subdural hematoma evacuation. Another anatomic finding on the CT scan of the brain from July 29, 2019, is the persistence of pneumocephaly, or air in the intracranial cavity. This is a common finding up to several weeks or a month post-craniotomy, but to have it present eight months post-operative is most unusual unless there is a persistent dural rent, allowing the egress of cerebrospinal fluid (discussed above); however, this is also a point of ingress of air (the pneumocephaly) and of greater concern, the potential for ingress of bacteria or other infectious agents. This latter could lead to the development of meningitis or brain abscess. Again, in this case, the only etiology of this persistent dural rent is the actions of Dr. Hussain at the time of TMJ surgery, and again, this was a breach of the applicable standard of care.

**Response:** Admits that a supplemental report is provided that states those opinions as those of a doctor with the referenced name, but denies the validity and accuracy of those opinions and specifically denies that any VA physicians failed to meet the standard of care or caused plaintiff any injury. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; accordingly, they are denied.

13. **Complaint:** Dr. Levin thereafter submitted a supplemental report of his own:
As stated in my [initial] report, I was of the opinion that the most probable cause of the actual subdural hematoma that Mr. Marquez suffered, was due to surgical technique that was beneath the standard of care. Specifically, this opinion was based on the combination of a probable communication between the glenoid fossa and the intracranial fossa, thereby allowing fluid under

10

pressure (insufflation/lavage) causing disruption of the skull base cranial vessel/vessels producing a subdural hematoma. With the additional information regarding a "dural tear", at this time, I am of the opinion that insufflation/lavage alone did not cause the subdural hematoma, rather a direct injury to the cerebral vessels involved in this incident occurred. This opinion is based on the improper technique of entering the joint space itself and/or insertion of the out-flow needle in combination with the fact of a probable pre-existing communication between the fossa's. In summary, I am of the opinion the probable cause of the subdural hematoma is improper (beneath the standard of care) surgical technique thereby causing direct trauma to the cerebral vessel/vessel's involved.

**Response:** Admits that a supplemental report is provided that states those opinions as those of a doctor with the referenced name, but denies the validity and accuracy of those opinions and specifically denies that any VA physicians failed to meet the standard of care or caused plaintiff any injury. Defendant otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; accordingly, they are denied.

14. **Complaint:** Taken together, the findings and opinions of Drs. Levin and Skaletsky establish that Plaintiff's subdural hematoma resulted from multiple acts of negligence on Defendant's part. Defendant failed to exhaust non-surgical options for treatment. Defendant thereafter compounded this error by electing to perform an arthroscopic surgical procedure despite being in possession of pre-surgical MRI images showing probable communication between Plaintiff's superior joint space and his cranial base/fossa. At the same time, Defendant failed to warn Plaintiff of the enhanced risks of the arthroscopic procedure he was undertaking. And finally, Defendant performed the surgery itself in a wholly deficient manner, causing an intra-operative

rupture of a right-sided subdural vein, the result of Dr. Hussain's penetration of the dura at the base of the temporal lobe with a surgical instrument and/or Defendant's mishandling of fluid under pressure (insufflation/lavage).

        **Response:** Denies.

15.    **Complaint:** Alternatively, Defendant's negligence is clear under the doctrine of res ipsa loquitur. Plaintiff suffered an acute subdural hematoma while under Defendant's control and/or management, and such an injury ordinarily would not have occurred had Dr. Hussain and his surgical team not been negligent. There is no reasonable explanation for Plaintiff's hematoma – which manifested itself immediately following the surgery and in a location immediately adjacent to the planned site of the surgery – except Defendant's negligence.

        **Response:** Denies.

16.    **Complaint:** As a direct and proximate result of Defendant's failure to abide by the applicable standard of care and Plaintiff's resulting subdural hematoma, Benjamin now suffers from the following permanent impairments: Cognitive deterioration (reduced ability to focus, concentrate, recall, learn, etc.); lateral deviation of the right eye with double vision necessitating use of an eye patch; vertigo; right side hemiparesis; abduction of the right leg with external rotation; difficulty staying upright for periods of time; substantial loss of dexterity in the right arm and hand; substantial loss of hearing on the right side; right-side tremors; inability to raise hands above shoulder; impaired bladder control; impaired ability to sleep. Benjamin is now largely confined to his home. It is difficult for him to navigate the stairs leading to and from his house, especially in winter or other bad weather. And once outside, he can walk only short distances using a cane. He feels safe driving only short distances; he cannot drive in lane traffic, at night or in bad weather. Likewise, Benjamin is largely confined to the main floor of his home. The stairs to both

the attic and the basement are treacherous, especially for someone in his condition. Even after obtaining wheelchair accessible housing pursuant to his life care plan, he will need to be surrounded at all times by caretakers, depriving him of privacy. Benjamin can no longer exercise as he has in the past or otherwise maintain his prior level of physical fitness. Due to his loss of dexterity, Benjamin can no longer prepare healthy meals as he has in the past, causing a substantial deterioration in his diet. Benjamin's loss of dexterity has also greatly impaired his ability to perform household chores and maintenance. Benjamin's ability to play guitar has likewise been substantially degraded due to his impaired dexterity and his inability to recall old pieces of music (or learn new ones). Music played a central role in his life prior to his surgery, both because of his intrinsic enjoyment of it and because his social life revolved around playing with friends. He deeply feels the loss of these aspects of his life. Between the loss of his ability to leave his home and the loss of his ability to play music, Benjamin no longer enjoys an active social life. Benjamin also finds it difficult to pass the time either reading or watching television, due to the concentration required and the impairment of his vision. His loss of dexterity and memory further impairs his ability to use a computer. Benjamin can no longer attend classes or otherwise pursue independent studies in his various areas of interest (e.g., history, math, astronomy). Benjamin is well aware of his mental deterioration and his resulting social isolation, exacerbating his feelings of anxiety and depression.

**Response:** Defendant denies that it failed to meet any standard of care or caused plaintiff any injury, and otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; accordingly, they are denied.

17. **Complaint:** Accordingly, Benjamin has been damaged in at least the following respects: a. He has experienced a substantial loss of normal life, i.e., a permanent and substantial

diminution in the quality and value of his remaining life. b. He will require round-the-clock care for the rest of his life.

**Response:** Defendant denies that it caused plaintiff any damages, and otherwise lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph; accordingly, they are denied.

18. **Complaint:** As set forth in the Claim submitted to the VA, and based on the expert reports attached thereto of Drs. Yarkony, Smith and Adams, Plaintiff currently estimates his damages to exceed $13 million.

**Response:** Denies.

Any allegation in any paragraph of the Complaint or inference drawn therefrom that is not specifically admitted in one of the preceding responses is denied.

WHEREFORE, the United States of America requests that this case be dismissed with costs and that the court should award such further relief as may be appropriate.

    Respectfully submitted,

    JOHN R. LAUSCH, Jr.
    United States Attorney

    By: s/ Sarah J. North
        SARAH J. NORTH
        Assistant United States Attorney
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 353-1413
        sarah.north@usdoj.gov